Good morning. I'm going to reserve about 3 or 4 minutes for the end if I can. The entirety of the direct evidence against my client, I didn't represent her at trial, but I did represent her at the Court of Appeal level through the state proceedings in here. The entirety of the direct evidence against her was the statement of the son of the victim, a 10-year-old boy, who had a gunshot wound to the head. I'm going to reserve about 3 or 4 minutes for the end if I can. and the supporting conversations, the support to that statement from Jesse's dad, Manuel. The defense did not have the opportunity to do a full cross-examination with regard to that direct evidence and it went straight to the center of the bullseye of this case. At the time, young Jesse made his statement, made the identification of the person who he saw at the door. He answered the door. It was that person who was the shooter. The identification was made with an observation period which was very short, limited lighting observational opportunity. He was asked on three separate occasions afterwards, can you tell me who it was? Who was that person? And on each of those occasions, both to the 911 call, to the first police officer, and to the others, he said, I cannot. And that wouldn't have mattered very much, except for the fact that the defendant was someone that Jesse in fact knew. Knew by sight, knew by name, and knew by context in terms of being at the premises. If it had been a stranger who was charged in this case, and there was not a failure to identify it by young Jesse, then the issue wouldn't have been nearly as critical. But in this case, there was a situation where Jesse says, I know this person, and didn't identify her on three separate occasions, and the defense contends that it wasn't until the police in fact planted that memory or that thought in his mind by the constant assertions, and isn't this the person, and showing a single photo, that finally young Jesse says yes. The defense says that there was all these statements before the police showed the picture where Jesse denied knowing who it was, and only changed it later on. To respond to that. To the police officer, going in reverse order, well in further disorder, when he comes and tells his mom there's somebody at the door, he doesn't identify who it is. When he calls the 911 and makes the call there, he says somebody came to the door, he doesn't deny who it was. And to the police when he's first interrogated, questions is a better word, when he was first questioned, he says I don't know who it was. On all three of those occasions, he says I don't know who it is. The response from the process counsel. You just equated I don't know who it is without giving the name of the person. Is that really your argument? In the first two instances? I can't, well. I mean he doesn't say. That's true. I agree with the court. That I'm inferring that when he calls and says someone came to the door, or doesn't identify it coming to the door, who shot your mommy, or what happened, when he doesn't make the identification, I'm inferring that he is saying I don't know who it was. I don't know who it is. And I agree that. But quite frankly, I think that's a very reasonable assumption. He's on the 911 call, they're asking him who did this, what happened. Well, did they say who did it? And did he say I killed someone? His 911 call says that someone came to the door. Well, he was conveying the most important thing. It could be that. Someone shot his mother. That's true. It could clearly be that. If we pick these at one point out of it, it could be that. But on the third time, did the officer testify that he said to him, who shot your mother, and he said I don't know? That's correct. The testimony was as to that, that I don't know who it was. Do you know who it was? This is the very initial statement. This is the very initial statement. Then they did more investigation. But to support all of that attack which was being made on Jesse, there was the statement of his father. And when his father came to court, Manuel, he said that's not so at all. Jesse immediately told me that Mara had done this, the friend of Yenny. I saw my wife. Well, they weren't married. I saw my putative wife there. I came to her. She was still on the ground. I turned to my son, and I said, Jesse, who did this? Who did this? And he said it was Mara. The only evidence of identity was the testimony, the evidence from this young child? The only direct evidence of that. There was circumstantial evidence. What about Johnson and Moore? I'm happy to address the situation of the snitches. I call the snitches more indirect evidence as well. Confessions to the snitches, though. Admissions, confessions to the snitches. I shot her because she messed with my family with a .357 Magnum. And I think you oversell your case when you try to tell us that the only evidence is the evidence of this child. I mean, there's two confessions. Now there are problems with the witnesses. I thought I was saying that they're only direct evidence, because I consider statements after the fact to again be circumstantial evidence. But I don't mind if we group it into that category. It doesn't matter to me whether we address it right now or get to it when I talk about the indirect evidence that was there. I think, though, I'm better off, I would like to finish my thought on the statement with regards to Jesse and the father. I'm not trying to ignore at all, Your Honor, the question of the problems with Moore and Johnson, and I want to address that. But if I can finish my thought with regards to why Manuel was so important. Because this is a bit subtle, but quite frankly, I think it's very, very important. In my mind, at least as I saw the juries looking at this case and when I read it, the reason why I highlight and start with Jesse is because that's the full bright light. And whether or not we call that the only direct evidence or the most important direct evidence, whatever, to me, it is the center of the case. When Manuel comes and says to the jury, my son immediately told me, immediately told me, and my wife is still on the ground, I said to him, who did this, Jesse? And he says, it was Mara. It was Mara? It was Mara? Yes, it was Mara. In fact, there was so limited cross-examination about that point that it was called into tremendous dispute. Number one, the statement wasn't made to the police officer by Manuel for ten days later. But perhaps more important than that, you got to wonder why was that delayed by that time period. But forget that, too. It's a very emotional time. What is not in dispute is that immediately after he sees his wife and he gets the statement from his son, he's asked by the police, tell me, do you know who did this? And what he says to the police is, I think it was Yenny. Now, if a father just heard from his son that his son identified the killer and identified it by name and said it was Mara, then why is he immediately thereafter going to the police and saying, I believe it was Yenny? I think the reasonable inference there, the powerful, compelling inference there, is in fact that he never had such an early conversation with his son where his son said that it was Mara. And that does two things. If he had the conversation, if he never had the conversation, it puts into dispute his own credibility. But just as importantly, it puts into dispute the credibility of young Jesse, because now it's another time when Jesse was asked who did this and doesn't say who it is. But wouldn't the cross-examination be limited to evidence that could be properly received by the court? By the jury? By the jury. Yes. And what specifically would have been the basis for that testimony? I'm unclear. It would seem to me that the testimony that you would say was improperly restricted was testimony that someone said to me, in this instance his son, said to me someone did it. And that would draw a hearsay objection. Yes, of course it's hearsay. It's admitted on the hearsay grounds. I mean, it was admitted on hearsay grounds to overcome a challenge to the credibility of Jesse. And a cross-examination would have been hearsay equally admissible. The situation would have been, tell me, Mr. Gellman, as the father, you're telling me that your son immediately, before you talked to the police, told you that it was Mara who did it, and then repeated it on a second occasion. Tell me, sir, please, why, when you talked to the police not five minutes later during a 10 to 15-minute interview, you didn't tell them that. Tell me, please, why it is you believe and told the police that you thought it was Yenny who did that. And then the jury would have laid eyes on a witness and would have seen that witness under what the courts have described as a crucible of cross-examination to see what his explanation could possibly have been as to why he would have been just told by his son that Mara did it, didn't tell that to the police, and in fact told the police that he thought it was Yenny who did it. That, to me, is a powerful impeachment of both Manuel, the father, and also of the son of young Jesse. And that, of course, is hearsay, but that's the nature of the inconsistent prior statement that would have been clearly admissible. There's no dispute it would have been admissible. What the courts have said is that it came out through the back door. It came in through the back door anyway. And so there's never been any question that it was admissible. It's always been an issue that it's harmless because it got presented to the jury in any event through the testimony of the police officer, not Manuel, but the testimony of the police officer who took the statement from Manuel. And the defense position is that that's not nearly good enough, that that really handcuffed the defense, that the officer's testimony kind of cleansed it and cleaned it up where she said, yes, I heard it, but I didn't really think it was so, and he wasn't really saying it that strongly. It just sort of referred to Yenny. All reasons in support of viewing it as hearsay when it's going to come in through basically a different person. I mean, it strikes me, counsel, there's a reason for these rules, one of which is that you don't want to, in effect, wander the testimony any more than you have to. And in this instance, we have the statement, the officer testifying about the statement to the officer, as opposed to what you want to do, which is then to have the father testify about this. Well, the father is the declarant. The father is the person who made the statement. So you want to question that declarant about the statement, as opposed to the person who heard the declarant say it. So what I think is the – that's why I think that the presentation through the officer doesn't nearly satisfy what could have been obtained and must have been obtained and should have been obtained directly through Manuel. The officer – the jury was laying eyes on the officer saying it, and she kind of cleaned it up a little bit. But it's not her impression which is so important. We want the jury to take a look at the very person who is making the statement. That's the person who they have to evaluate in terms of credibility. And that was denied to them. And there's no justification for the denial. So the question is, was it important? And I submit that it goes to the heart of Manuel's own viewpoint, and well, it goes to the credibility of Jesse. Not only would Manuel's support of Jesse have been taken away, but I think it would have attacked Jesse himself, because there's no question there was a conversation between Manuel and his son. And if, in fact, Manuel didn't tell that to the police, in other words, didn't tell the police immediately what supposedly Jesse had told them, if, in fact, he didn't tell them that because it never was said by Jesse, that would have been yet another time, Your Honor, where Jesse was asked by his father, what happened? Do you know who it was? Do you know who it was? Either said it was Yanny or said, I don't know. And that would have been another powerful impeachment of 10-year-old Jesse. The other direct evidence, I'll be happy to turn to it now, Your Honor, as to whether or not the statements of Moore and Johnson, which are the, quote, confessions of my client. There were actually three snitches there. There were one of whom said that my client never made any statements and didn't talk about her case at all. But Moore and Johnson said that they, in fact, that she, that they got the statements from her and she did confess. Well, of course, when they got to trial, they recanted. When they got to trial, they knew that they were. They didn't recant. They said they didn't remember. Yeah. They didn't say she never said that. They said, we don't remember. Okay. And there's a tooth fairy, and I still put my tooth underneath and hope to get some money. The fact of it is they were in there with the person. They said they don't even remember making the statement to the police. They were, they made, it's taped, recorded statements. They were interviewed about it. And it was utterly absurd for them to say, it's utterly unbelievable for anyone to, when they take a look at their statement and saying, I don't remember saying that. I don't remember actually saying it to the police. I think what they're clearly, the inference was, is they're trying to take it back. They don't want to be labeled as snitches later on. They don't want to go under the public light of doing it. But whatever. They changed material what happened. And because of that, apparently, defense counsel, who was doing the first murder trial he had ever done, felt that that recantation or that major change, however you characterize it, was such that you didn't have to do any investigation to try to impeach him. It was as if putting him. That was a tactical decision made by counsel, not to investigate because they weren't going to testify against his client. Yes. Yes, it was. And it's so utterly below that of minimally competent representation. What should counsel have done? Exactly what we did when we did this matter, is that we should have investigated this. We should have, number one, known that whether or not they're going to recant or change, it's going to come in anyway. Because competent counsel would know that prior statements like that are going to come in through the back, through the tape recorder. And they did. And of course they did. So counsel should have obviously known that. So he has to know that the jury is going to hear that and has to know that if he's going to be successful with impeaching that, he better do competent representation, which requires investigation. Had he done the investigation, he would have talked to Ms. Johnson's dad, and he would have found out that Ms. Johnson's own father didn't believe her, that Ms. Johnson's own father believed that his daughter was on drugs, that Ms. Johnson's own father believed she's a liar, and that Mr. Johnson's own – Ms. Johnson's own father said that she had changed her version when she talked to him. They would have found out the priors that Ms. Moore had in other cases and would have been able to impeach her. So, yes, if you want to call it a decision that I'm going to – Impeach her how? Impeach who? Moore or Johnson? Either one. Well, they say I don't remember.  It's coming – you impeach the statement that comes in to the jury. The fact that the witness says I don't remember making the statement doesn't stop it from coming into the jury. So you impeach the statement? Of course. Right. But you do so by doing the same thing that you have to do when somebody is on the stand testifying. The fact that – I guess it's a little bit more subtle for defense counsel to be needing to do that investigation because he – because you're not going to have the witness there to be able to cross-examine. But you have to present this through – either through the witness, Moore, and Johnson themselves, or you bring the father in. And you do exactly what the defense was able to do on behalf of Ms. Plasencia afterwards, namely talk to the witnesses and do proper representation and do proper investigation on the case. While this was going on stopping the defense, either through the conduct of the court and the conduct of defense counsel, from presenting a whole slew of passionate, sympathetic materials on behalf of the victim, totally irrelevant, as well as attack Ms. Plasencia as a drug user, someone who uses this kind of drug usually after someone who uses heroin, and paint her and attack her character. And I'll be happy to go into that, but I think at this point I'll reserve the balance of my time. Thank you. Thank you very much. Good afternoon. May it please the Court. Deputy Attorney General Marilyn George on behalf of the appellee. It's hard for me to believe that we're talking about the same case because my reading of the record is so entirely different than opposing counsels. Firstly, and I'd like to take issue with the representation counsel made about whether or not the victim, Teresa Silva, was married to her husband, Manuel Galdamez. He interchangeably refers to them in the briefing as wife or husband and wife, common-law wife, girlfriend. And yet he also criticizes, as part of the sympathy evidence, the fact that Mr. Galdamez testified that they'd been married for 13 years when his wife was murdered. Now, the appellant's name in this case is Mara Plasencia. Jesse, who lived in the apartment complex of Mara Plasencia, his cousin Jenny, which I think is actually Jenny, but in Spanish a J is pronounced like a Y. He was familiar with the appellant, but he didn't really know her. He recognized her. And when, after his mother was shot, after he had answered the door and then told his mother there was someone at the door, and his father came running back from the garage, and apparently, from my reading of the record, the garage is sort of behind the apartment on like an alley. And that was actually the cause of the contention between the neighbors, that one of Jenny's uncles was parking in front of their garage. When he would go visit them, he would park in the alley and block their garage. And that's what started this whole thing. But when Mr. Galdamez ran up to the apartment after he heard the gunshots, he asked Jesse to call 911, and he said, who did this? And Jesse's words were, I don't know, I don't know. So, to him, that was the very moment, he said, no. And that was also what Jesse testified to his father at that moment, where it was Madda or Madaca, that girl that's always with Jenny. How do we know that? That is not only what Jesse testified, he said, that is also what Mr. Galdamez testified was said to him. Now, the issue about the impeachment of Madda was, when the police arrived in response to the 911 call, they took the children to a neighbor's apartment. The police were interviewing Mr. Galdamez, and they asked him, was your wife having trouble with anyone? And his response was, no, well, just one. It must have been Jenny. Well, Mr. Galdamez wasn't a witness to the shooting. No, but they didn't ask him whether he knew who shot the wife. It was in the course of that questioning that he said to the police at that time, it must have been Jenny. He said to the police it must have been Jenny after his son said to him it was Mara? That's correct. And that evidence was put before the jury. Now, what is important to understand is that Mr. Galdamez was much more distressed at the time than his son, Jesse. I want to get something clear. The first thing that the child said was what? The first thing he said in response to his father, it was Mada, or Madaca, the girl that's always with Jenny. So they're two different people. Well, Jenny is the neighbor, and Jenny is... The boy didn't know her name exactly, and he was close when he said Mada, because her first name is Mara. But he didn't know the appellant that well. It was someone he had seen around the apartment complex. He knew she was always hanging around with Jenny. If you don't know all this background, it sounds like he's saying girl A did it, who's always with girl B. That's right. That's right. And that's what Mr. Galdamez testified to. When Mr. Galdamez was asked if he had told the police that Jenny did it, his testimony was that he didn't remember saying that. But his words... I don't think there were that many problems with his testimony. Was he consistent throughout? Is that what he told the police? He was. In fact, between the time of the 911 call and the time of the APB for a woman named Mara, they didn't have a last name. It was only 20 minutes. So all of this confusion that counsel would like you to believe happened, and all of these times where he represents that Jesse could have identified her or Jenny said he didn't know who it was. The only time he ever said he wasn't sure was when the police initially spoke to him. He was in a neighbor's apartment and one of the detectives asked him who did it. And he said, I don't know. I'm not sure. The police... He said it at that point. Before he said that to the police, the only other statement he made was to his father. And his father, when he spoke to the police, said it was Jenny. His father said it must have been Jenny. Now, my personal reading of the record was that his father simply didn't process the information. That he didn't know who Mara Placencia was. And so the name didn't mean anything to him. I have a particular problem with Johnson and Moore and the failure to investigate. It's pretty clear that the testimony, albeit through the words of somebody else, or in other ways, came in. The confessions came in. And the decision not to investigate these two people seems to me to have been utterly unprofessional. I mean, you've got all these problems with the child's identification. You have these two confessions that come in and you don't do anything to investigate these jailhouse snitches. Well, the defense attorney at trial knew that these witnesses were going to recant. When they were called at the preliminary hearing, they both testified that they didn't remember talking to the police. So then how did he attack the integrity of the alleged confession? His approach was to simply say that they were trying to curry favor with the prosecution. That was what he argued, and that they weren't to be believed. And shouldn't you back that up with some investigation? Well, I think the fact that they were actually in custody at the time on other charges, obviously, and that they had recounted what they had said. I mean, they didn't say, oh, I got it wrong, or I just told the police that because I was hoping it would help me. They both testified that they didn't remember making the statements, period. They didn't deny anything. No, they were tape recorded. Yeah, they just went south on the whole thing. That's right. But doesn't a defense attorney have an obligation to try to attack the integrity of the supposed confessions to jailhouse informants who are notoriously unreliable? To what end? To show that the confessions never happened. Not just that the women weren't saying, well, we don't remember, but these were manufactured in the first place. But the whole point of this evidence was that there was no other way for these two, I hate to call them witnesses because they didn't actually testify at trial, but for these two women to have given the facts that they had to the police unless the information came from the appellant. They wouldn't have known. You ever heard of Leslie Vernon White? I mean, there is a long documented, documented history in this country explaining exactly how jailhouse snitches manufacture confessions and evidence in order to try to curry favor with law enforcement. This is documented. I believe that was the man who had made the phone calls from the jail and who pretended to be a probation officer and got information. That's right. There were 225 cases in Los Angeles alone that were investigated by the grand jury, which documented all of this stuff. The simplest thing in the world is to manufacture a confession or evidence from somebody that you're in jail with. Yeah. The difference is that this information was gathered very quickly and before the preliminary hearing in this case. This information was, she said she was on roaches, which is I guess what they call rohypnol, and appellant's blood tested positive for rohypnol. That she said, I told the little boy to go get his mother. That's exactly what Jesse testified happened. That she said that she shot the woman with the .357 Magnum. They never recovered a gun, but the bullets recovered showed that it could only have been fired by either a .38 or a .357 Magnum. And that was basically the essence of the information that was conveyed through those tape-recorded statements. So it really wouldn't have served any purpose to show, well, they're incredible, they're criminals, they have felony convictions, because their credibility had already been impeached by virtue of the fact that they had essentially recounted when they said they didn't remember making those statements. Most of the time when they're in jail, they simply say to somebody, why are you in here? Well, they say I shot my neighbor. Well, what do they say you used? I don't know, a .357 or something like that. And then they turn around and call the cops and say, hey, she just confessed to shooting her neighbor with a .357 Magnum. Well, then I would respond that the California court's rejection of that argument is reasonable and that it was consistent with the authority of the United States Supreme Court  and that it's this court's role to defer to the California court's findings unless this court finds that it's unreasonable. There's a mistake in the district court when the district court says these witnesses recanted their testimony. That's not what happened. I think that was a misstatement. Yeah. Because it wasn't... By recanting the informant's actions undermine any of their unsubstantiated testimony. They didn't recant at all. But they most certainly did. They denied making the statement. They said they didn't remember. Right. They said they didn't remember. The difference between I don't remember and I didn't make? Yes. And it was important. That's true. And it was important when I made the point with Mr. Galdin as his testimony. But the fact is, is that within a very short period of time, I don't recall the date of the preliminary hearing, but within a very short period of time from the time of appellant's arrest, which I believe was on October 5, 1998. Kim Jones. I have no idea. It was the name that came up in the respondent's reply brief. The court says here, counsel's failure was especially problematic because the informant's obtained their knowledge of the crime from Kim Jones. You don't know who Kim Jones is? I do not know, and there's no cite to the record. Petitioner's traverse at 13. How's that for a cite to the record? On the, I'm sorry, what are you looking at? I'm looking at the. Petitioner's traverse. No, I'm looking at the. That's the appellant's. Report and recommendation of the magistrate judge. Oh, I see. Yes, that's true. Corpus dated June 2. That's true. The magistrate judge was pointing out that that information was put forward by the petitioner. This was on the original habeas corpus petition, and that was the appellant's counsel, Mara Placencia's counsel, put it forth for the first time in the traverse. After I had filed the response, I'm sorry, the answer to the petition, it was put forward in the traverse to that answer. I would say that I think I've adequately briefed this. I will answer any further questions if I possibly can, but that in this case there is nothing to suggest that the appellant had anything less than a fair trial. That's what she was entitled to, and that's what she received. Thank you. Kim Jones was the person who leaked the information, who could have been a leak of the information regarding how Moore and Johnson got their information. Besides what the Court just said, they could create it out of quite basic facts and so forth. Jones was the one who could have provided that information independently because that person received information from her father. They were all sellies, and that could have been the source of how they got that information. This is something about the fact that the district court ruled that this recantation or even if it's a change somehow makes it less credible that they shouldn't they were already attacked. As a trial counsel, let me tell you it works exactly the opposite. When a snitch comes forward, gives a full statement, by the way, it wasn't the words of the officer who brought their statement. It was their own words. The tape recording actually was played to the jury. When a snitch comes forward and confesses or makes a statement to the police that someone has confessed to me, and that tape recording is there, and then when he or she gets to court and says, I don't remember what happened or it didn't really happen or anything like that, that actually adds credibility to the original inference. It requires even more aggressive cross-examination in impeachment because what usually happens is that the jury thinks and the D.A. would argue the reason why the snitch is changing her mind is because it really happened, but if I go forward in the light of day and say it really happened, everybody's going to call me a snitch and I'm going to get killed when I go to prison because they didn't get what I wanted out of this particular deal. So they can throw out any sort of floating idea and that's why they have to back out. That makes it worse for the defense. So the district court's finding that that somehow supported the snitches, in fact, is the opposite. It makes it actually worse for the defense in that regard. The information, the snitches were not a small – only a small part of this case. The combination of it all was so forth – was very big. And for the district court to conclude that if there was error, it was of a de minimis or harmless matter and that we should grant great deference. Quite frankly, this was an error of great proportion. And the trial counsel himself says, had I known how to do this better, I would have done it differently and I would not do this again. His declaration is before this court as part of the record. He said, this was my first murder trial and had I known this, I would not have done it this way. The next time through, I won't. And that's very – The prejudice that flows from this failure is what? Prejudice flows from this failure is that it supports a very shaky identification. Had there been an investigation, what would the investigation have revealed? That Johnson herself is a liar because someone says so. Someone who the jury would believe because that someone is her own father. That Johnson herself is – gave different statements about what really happened to someone, again, who would be believed because it was her father. That Johnson is on drugs and had given up her life to these drugs and was not believable in a variety of ways. Someone who said that would have been believed because it was her father. As to Moore, the attack would have been that the – that she has these prior records in other jurisdictions, so her credibility would have been attacked. And Kim Jones and all of that would have been there to answer the prosecution's question, how could they possibly have gotten this information if it didn't come from Mara Placencia? Namely, it came from this other source. How do we know it came from Kim Jones and the other source? We only know because that was a statement that was given to the police – I mean, to the defense investigators afterwards. It said it was available for that. We – there's no way to know exactly if these snitches developed this by exactly as the court said. If they read it in the paper, if they heard about it, it was a high-publicity case. It got a lot of publicity at the time. So I'm not sure exactly – we couldn't have proven why. Did they have paper that the murder was committed with a 357 or a 38? Actually, there was media of a variety of sources. And quite frankly, I don't think that – I said newspaper, but I don't think that jails are getting that newspaper. It was on the news. And I don't know – I have a transcript of all the news reports that came out with regards to this that hit the TVs. It was big. The point of it is the whole issue would have been placed to the jury saying you can't believe these people. And if you can't believe them, what are you left with? The shaky identification of a scared 10-year-old boy and then all of that. This wasn't a level playing field. Ms. Placencia should have a new trial to take care of that. Thank you, Captain. Thanks very much, Your Honor.
judges: Reinhardt, Trott, Robart